Case number 14-1150, Center for Regulatory Reasonableness Petitioner v. Environmental Protection Agency Mr. Hall for the petitioner, Mr. Doyle for the respondent Good morning. May it please the court, my name is John Hall. I am counsel for the petitioner, Center for Regulatory Reasonableness. I'd like to reserve five minutes for rebuttal. With me today are Gary Cohen and Philip Rosenden. We were also petitioner's counsel in Iowa League of Cities v. EPA. The prior Clean Water Act Section 509 decision, that's a focal point in this case. As the court's aware, that decision vacated three ad hoc NPDES rule modifications that sought to prohibit bacteria mixing zones in the practice known as blending. The court's finding EPA's actions irreconcilable with the adopted rules and the blending provision beyond EPA's statutory authority. CRR respectfully asserts that there are two reasons that our petition for review should be granted. First, the record before the court is clear. EPA rendered and published the final decision to not acquiesce and to continue imposing the vacated rule prohibitions outside the Eighth Circuit, causing the same direct and immediate harm now to that regulated community and once again without rulemaking. Number two, that this decision committed to additional ultra-various acts. It disregarded the Act's judicial review provision, which does not allow acquiescence in this instance on Section 509B1E decisions, and created a more restrictive technology-based and minimum NPDES rule approach based on geographic region or location. And that's contrary to the Act's national uniformity requirement. Let's talk about the... Yes, Your Honor. For us to have jurisdiction, we have to fit this into re-promulgation of an affluent limitation or other limitation, simplifying slightly. It's very hard for me to see how a decision, even though incredibly clear, it's not quite as clear as one might expect, but a non-acquiescence decision where it comes down straight from the top, universal, we won't acquiesce. How is that a re-promulgation of an affluent limitation? It's a non-acquiescence decision. Well, Your Honor, it's a decision post-Iowa League, just like occurred, for example, in NIDACAP, which was the recent Clean Air Act case that this Court dealt with. In the District Court. There was no question of satisfying 1369. Well, you know, in this particular instance, post-Iowa League, EPA had a decision to make. Were they going to follow that decision nationwide and then not continue to impose the rule prohibitions that the Eighth Circuit said were illegal? Or would they say, no, we're going to just continue that same set of requirements? That's a second decision. We would submit to the Court that that certainly would qualify as a re-promulgation, a decision to once again, after looking at a negative court ruling, to decide to continue going along and impose those requirements. These are requirements, again, that were never adopted in law. Let me put it another way. In litigation under the rule and the interpretation of the rule, is there any reason why any party would point to the non-acquiescence decision as contributing to the presence of the litigation? In other words, wouldn't litigation under the original rule and the interpretation in the Grassley letter, encapsulated in the Grassley letters, wouldn't all that just proceed as if Iowa League, of course, would be important as a district precedent, but no one would have to turn to the non-acquiescence decision as a legally authoritative decision? Your Honor, I think if I understand your question, you're asking whether or not anyone else in the agency would point to its authority to non-acquiesce as its ability to continue imposing the requirements. The agency certainly would point to that. And they would state that the Eighth Circuit decision doesn't control, which is what they've done, and that they can continue to impose the same requirements. In the permitting process, I think the question is, this has no legal impact, I think is what we're getting at in terms of the inquiry. If that's the question that's being asked, the legal impact. I'm sorry, Judge Williams, I certainly did not pick up the nuance of the question in my oversight. The legal consequences are certainly the same. We've got community after community who, just as in the Iowa League case, is in the process of trying to determine how to comply. What am I allowed to construct? But there are no additional legal consequences from the non-acquiescence. In other words, when there's a judicial review proceeding, say, of a denied permit, there's going to be EPA or the government can't rely on the non-acquiescence letter. It's meaningless. In other words, it's like we've had a couple cases recently that the government relies on national mining, but other cases going back before where it's as if it doesn't exist when the ultimate judicial review proceeding occurs. Your Honor, to indicate that it doesn't exist, but if you will not respect the actual reality of the situation, when the agency, after the Iowa League decision, sent out to the state and regional and delegated states and to the regional offices, the death statement, which, as you know, we finally got after a year and a half of trying to get records from the agency, which specifically said, inside the Eighth Circuit, we will respect the decision. Outside the Eighth Circuit, we will continue to apply our, quote, existing rule interpretation. The existing rule interpretation, of course, is the one that was vacated by the Eighth Circuit. Now we have states and regions telling parties, if you do X, meaning, for example, blend, if you decide as part of your CSO treatment program that you're going to build blending to comply, after you design it and go to build it, I'm going to tell you it's illegal. So the cities, it's no different than the situation that caused Iowa League to occur. The cities are left in the spot of either bowing to the position that the agency has announced that it's going to continue to impose these requirements, or risking their money and then ending up in an obvious condition later on to fight the issue. And that is a recognized harm in numerous cases before this court. It's really no different. My question didn't have to do with standing or finality or rightness. I'm sorry? My question did not have to do with standing, finality, or rightness. Okay. Only with respect to satisfying a statutory standard under 1369. Oh, whether or not the position would be, for example, considered a promulgation? I mean, this 1369. A promulgation of an affluent or other limitation. An affluent limitation or other limitation. Well, certainly a restriction on whether or not you're going to properly interpret the bypass rule to prohibit a certain design practice at a treatment plant is a limitation or other limitation on the operation. What's building in your argument is the assumption that the Eighth Circuit decision, ipso facto, knocked out the decision reflecting the grassy matters beyond the Eighth Circuit. Well, yes, Your Honor. I mean, that certainly is, in terms of the way the Clean Water Act is structured, under Section 509B1E there's only allowed to be one circuit court decision on a particular issue. Well, EPA's argument on this, if I say what the government's position was on the brief, is that when we're talking about illegal rulemaking, we don't have to follow 509B1E decisions. They also made an indication that if there's only a single party that's raised the challenge under 509B1E, then the national applicability doesn't apply. Well, of course, the statute doesn't say that, nor does the consolidation provision of 18 U.S. Code 2112A. You consolidate, of course, to ensure there can only be one decision. Of course, if there's already only one petitioner regarding a particular decision or action, then there's already only one decision that can be rendered. Under any set of circumstances, you can't have two circuit courts deciding it. I would point out even the last— You say that very tactfully, but suppose the validity of grassroot policy came up in the course of a permanent issue in the Second Circuit five years after the policy was adopted. You say that the Second Circuit campaign came. Can it come out differently from the Eighth Circuit? Let me break that down into two parts, Judge Williams. If a party had never previously challenged the policy and it came up to the Second Circuit, well, then it would be a new issue. And if somebody was attacking it under 509B1E, there you have it. It's certainly the first decision. If there's an already existing decision, by the way, existing, positive or negative, I mean, if the issue was raised and somebody lost that issue before Circuit Court 509B1E, then most certainly the agency or whoever's litigating the issue subsequently is going to raise, you can't have a second decision.  Well, finally— It's a favorable decision, but— You're right. A 509 on its face doesn't like— Respectful to each other, but not obeisance. Well, I would suggest the 509 on its face does not allow that. 509 expressly says that an issue that could have been raised within 120 days of the promulgation or the rule adoption cannot be raised at the time of permitting and cannot be raised in an enforcement action. So, if in a rulemaking case the issue is decided, then the plain language of 509 precludes another party 120 days after the date of the decision from raising another case. Or else you'd have the serial, whether or not you win or lose a 509 decision, then you just go to another Circuit Court and say, well, I now want to challenge it now, but in a permitting context. The 120-day provision precludes that on its face. So, that's why, in fact, the Iowa League of Cities brought its case because its permittees were being adversely affected. They did not want to have to deal with this permit-by-permit and risk money not knowing whether or not something was lawful or not. So, they're allowed to take a legal rulemaking challenge. If somebody's amending a legislative rule, amendments to legislative rules are legislative rules as this Court has ruled in many cases. And so, they went forward on the matter, challenged it to try to clarify it in a single case and then forcing what permittees to what re-litigate over and over as if the case didn't occur. That would actually, at least in my view, promote legal rulemaking as opposed to rulemaking. Because if it was a regular rulemaking case, no one would tolerate ignoring a 509-B1E decision. As a matter of fact, I think this is the only case I've ever seen in the history of the Clean Water Act where a 509-B1E decision wasn't followed. You've mentioned a couple times the build it and then the permits denied. Can you explain the timing as that usually occurs? Oh, certainly. As a matter of fact, the affidavits that we have are directly on point on that. One good example is Allentown, Pennsylvania, who's under a federal administrative order right now to comply with eliminating overflows occurring upstream in their system. One of the solutions that they could immediately implement is blending at the wastewater plant to bring more flow in so the overflows don't occur. So EPA has them under an order with ongoing noncompliance, and we have been asking repeatedly from the agency, will the agency authorize and allow blending to occur as a solution? Of course, we now know the answer is no. But that's causing an immediate compliance problem, and it's immediately affecting their ability to, what, do we now just go ahead and design the thing we know they're going to say is illegal, keep ourselves possibly in noncompliance longer, or do we just say, okay, we'll spend $37 million more and not blend? North Hudson Sewage Authority, they were a part of it, and that's in New Jersey. They were a group of 15, 18 municipalities in New Jersey that got CSO permits last year and to do what's known as long-term control planning. That's the basic design planning for eliminating combined sewer overflows. And we all live in Washington, D.C. We know D.C. just is looking to spend $2 billion to try to eliminate its combined sewer overflows. So the Jersey cities are in the midst of doing this. And during the permitting action, EPA informed the state of New Jersey, blending is still illegal, I am not going to allow the CSO communities to do that as part of the solution of the long-term control plan. So they are under a five-year schedule to get these long-term control plans in, these designs, these plans, these solutions. If they violate that schedule and submit a plan that is unapprovable, they're in violation of the permit, they now know that EPA has said this solution is illegal. So do they now? I don't understand how this works then. Once EPA says that or makes that statement that you can't do blending during the course of the permitting process, then why can't you formally challenge, bring a formal challenge then to that particular decision, if there's been such a decision made? That's a very good question, Judge Wilkins. It comes down to part of the way the Clean Water Act program is structured with delegated states. When EPA delegates the program to the state agencies, the states issue the permits. If EPA sends a letter or tells the state during the permitting process, and it's a state permitting process now, that we're not going to allow that, you need to tell the communities that it's illegal. If the state does not do that, EPA formally takes the permit, objects to it, and then takes over the permit. But state programs get all their money from EPA to operate. So when they get one of these, we will object unless you do X letters, they invariably just do what the agency says. The permittees, as of right now, do have objections raised on EPA telling the state to do this and the state saying it's illegal in the final permit. That is still ongoing. The last answer we got from the state was, we need to know from the federal government whether or not it's lawful or not. They're telling us what to do. If I'm in my state permit process in front of a state judge, the state just reports what EPA said and the state follows it. So they are looking to this case, actually, for the resolution of what they are allowed to do in New Jersey, because if they are allowed to blend, the communities will save literally a billion dollars on the CSO treatment for the entire area. If they are not allowed to blend, things are going to be a lot more expensive and we're going to have a lot more CSOs going into the water for a lot longer because it's a more difficult solution to eliminate them one at a time as opposed to just bring the flow into the plant and try to process it. But it's the way the system works. They put leverage on the states, force them to do what they do, and once they do it, EPA doesn't have to defend it. It's now in state court. So it's not an EPA defense. That's why we brought the Iowa case because the state of Iowa, if you go back and look at the record, in the case, Chuck Correll, who ran the state water program, filed an affidavit, and it was very fortunate that he did. Chuck put in the emails he had gotten from EPA Region 7 and headquarters, which said, if you don't object to blending and prevent it, we're going to start objecting to your permits. So in other words, the screws were being turned on the state agency officials. But what's the procedure by which, I guess in the state court process you're saying, that you could get judicial review of the legality of what's being done? In other words, say, under the government's view, you should lose this case because there's another, and I'm going to press them on this, there's another avenue to getting judicial review of this. What's your response to that? Well, that's certainly not. And before you've spent all the money you're talking about. Well, first off, the amount of time that we've got to get everything done, this state process is not going to be completed within that time frame. So we're under a narrower time frame. So the delay is part of it. It's not the building so much as the delay. The building and delay. Allentown is not even a state process. It's a federal administrative order telling them to eliminate certain overflows, and then they're being told on the side, you can't do it via blending. And why can't Allentown challenge that, to follow up on Judge Wilkins' question? And again, maybe I should be asking EPA this, and I will. They are, Your Honor. Allentown is a member of CRR. Yeah. So the challenge is via us. Yeah. But in that process, can individual permit denials, in other words, be? There is no individual permit denial in that instance. They're doing it under an enforcement order. It's kind of like a version of SAC-IT and HELCS and all of that. You know, you get these multiple ways. Right. Well, I know you're trying to get, and I understand this, the music from the Supreme Court in recent years has been in your favor. But it's a different kind of situation, and I think we really need to know the details. Again, maybe I'll ask EPA this, of when and how. If you can't challenge it in this proceeding, when and how can it be challenged? And I think that's going to be an important factor in this case. And I realize, Your Honor, that I'm out of time, so I'll just reserve the rest of my time, unless there's more questions, reserve the rest of my time for a while. Sure. But I would make just one last point. The Clean Water Act was structured to allow these kind of challenges to be brought up front. So you wouldn't be doing them serially in permitting. You wanted to know what the nationally applicable rules are. If they put one out, legally or illegally, you have 120 days to render your appeal. And if you don't, and that decision goes final, and the rulemaking action goes final, in permitting and thereafter in enforcement, you're not supposed to be able to challenge it. So we are here because this is the time and the place where you're supposed to be under the Clean Water Act for a nationally applicable regulatory requirement. Thank you. May it please the Court, I'm Andrew Doyle with the Department of Justice. With me today are Richard Witt and Mary Ellen Levine of the Office of General Counsel at EPA. In this case, the question is not whether judicial review will be available, but rather whether judicial review is available now. I borrow that phrase from this Court's decision in National Mining Association, and I think it's particularly apt here. That case, the Court dismissed a challenge to an EPA guidance document that advised its staff to ask state permitting authorities to assess certain environmental conditions when they're issuing NPDES permits there in the surface mining context. And the guidance document the Court held lacked finality under the Bennett v. Speer test. The Court found in particular that the guidance document lacked legal consequences. And lacking legal consequences or lacking legal effect, Judge Williams, is similar to the issue under the promulgation part of the judicial review provision. Let's just go back a bit in time to the 8th Circuit decision where the EPA argued very staunchly that there was no jurisdiction, particularly that the requirements of 1369 were not satisfied. Suppose that in the process of this permitting, in this permitting process, someone objects to the policy embodied in the drafting letters. What is the EPA going to say? So what will EPA say? Well, EPA has not made a decision what it will say, first of all, but the process allows all stakeholders, including the facility, including the community affected by the operations at the wastewater treatment plant, to comment during the permit process. If EPA steps in under its veto rights under the Clean Water Act, EPA will have to enunciate its views, give the state a chance to decide whether it wants a hearing, whether the state agrees with the EPA. If the state doesn't agree with the EPA, then the statute says that the permitting authority passes to the EPA, and then the EPA can take more public comment, can render a decision, explain what the scope of acquiescence, if any, from Iowa League that it's looking at, can respond to comments about blending. I'm asking a more particular question. Okay. That is, suppose there's an attack on the, I'll call it the draft policy, I'm not saying it's not an attack, however. Are you saying the EPA will say, oh, no, any attack on that is precluded under the subsection, the hanging paragraph in B-1, and you can't raise that? That was adjudicated in the Eighth Circuit. We will not be arguing that. How do you know? How do I know is because those letters are vacated. And if EPA, EPA never relied on those letters in any proceeding, to my knowledge, in any event, but they certainly could not rely on those letters now that they've been vacated. EPA would have to defend its policy that it applies in a permit situation on its own merits, under the Act, under the regulations, under the administrative record. It can't point to the letters it wrote to Senator Grassley. It can't point to the letters challenged here. It can't point to the death statement. If that is the policy that inevitably is going to be applied, just stick with me on that, and I understand your point, the contrary on that. Their point, I think, is why should we have to spend millions of dollars now, I mean millions of dollars to get later judicial review, wouldn't it be more efficient to just get judicial review up front of whether the policy is legal or not? If it is, then everyone knows what it is and goes for it. If it's not, then that saves everyone a lot of time as well. I think that's the substance of their concern is we're going to have to spend a lot of money and waste a lot of time to get the ultimate judicial review, and we should get that now. And what's the problem with that? Well, the problem with that is similar to the court addressed this in national mining. If I might quote, the court said, while regulated parties may feel pressured to voluntarily conform the behavior because they contend the writing is on the wall about what will be needed to obtain a permit, the court said that there has been no order compelling the regulated entity to do anything. But again, put aside citing national mining. They're concerned about the real world of it, not at-law treatise discussion. They're concerned about we're going to have to spend a lot of money to get the ultimate judicial review, and is that true or not? I don't know about the amount of money that they'll have to spend, but I will say this. When in the permitting process is judicial review available? I think we could use an overview of when, under your theory, the judicial review will occur. Right. Judicial review will occur before the state, if the state is the one issuing the final permit. The state will have to defend. If it's relying on something the EPA said or EPA's rationale, the state will have to defend that rationale. In state court. In state court, and that's where those final permit decisions are reviewed. There might be intermediate administrative law judges in the state, but ultimately the final state decision is reviewable in state court. And we cite that in our brief. That's clear. If EPA vetoes and then ultimately takes over the permitting because the state- And where is the state, the final, the state Supreme Court has the final say on that? Correct. Absent cert to the Supreme Court, that's correct. But the U.S. Supreme Court could review to the extent they're making an interpretation of federal law. That's correct. That's correct. And those cases always go through state court? They do. They do. When the state's the permitting authority. Correct. And their administrative record will have statements from EPA. And like I said earlier, it will also have records for and against lending. You know, there are arguments that it's good for preventing backups into buildings. It's good for getting rid of sanitary sewer overflows. But on the flip side, there's also arguments that there's no assurance that the pathogens are being treated correctly because you're going around the secondary treatment units. Let the community make their case before the state on those issues. I think the court is also understanding that the EPA, when it makes a final permitting decision after a veto, then that is reviewable directly in the Court of Appeals under the- And what's happening in Utah while all these things are- Yeah, what's- Right. Well, limitations in the permit are being reviewed. Correct. So most of these facilities, I think every facility in the standing affidavits here are under an existing NPDES permit. So they have authority to operate and have been operating. But until there's an issuance of a renewed NPDES permit setting a fixed effective date for compliance and imposing specific conditions on discharge, a facility need not modify any plant designs or upgrade their treatment controls to meet those conditions. What are you reading from? Yeah. Well, I'm reading from my notes because I want to be very careful about this. And the notes are frankly from a prior brief we filed in this court back in 2003. What was the unless clause there? The unless clause is- The unless, read it again maybe. Yes. Until issuance of an NPDES permit setting a fixed effective date for compliance- Until the issuance, okay. And imposing specific conditions on discharge, a POTW, publicly owned treatment work, need not modify plant designs or upgrade treatment controls to meet those conditions. It often works where, yes, you have to spend money to go through the permit process. We don't dispute that. But FTC and other finality cases make clear that's not what the finality doctrine is concerned with. But before anybody is required to redo their plant, they have to have a final permit decision requiring that. Okay. And they will have full rights during the permit process to make their views known, including their views on- So your point is they don't actually have to change anything, and I just want to get this nailed down. They don't have to- of how their plant operates until the permit has been denied, I suppose it would be. Denied or granted on conditions that they would contend agree with them. And when that permit, let's say, I'll use the word denied as shorthand for what you just said. When that permit's denied, they have two options then. They can sue in state court, assuming it's a state permitting process, or they can comply. That's correct. Okay. And the timing, I guess it's the timing they're concerned about. They'll have to either shut down the plant or spend the money unless the state permitting process moves along with some expedition. And I guess your response to that is that's tough. And I don't mean that pejoratively, but that's basically what you're saying. I think there's some element to that. That's correct. And they're saying that puts us in the position that the Supreme Court in recent years, the music of Sackett in other cases, has said people shouldn't be put in that position of spending millions of dollars to alter their plant or land, or Sackett's rivalously an unusual case, but to get the judicial review of whether what you're telling them is legal or not. In other words, when you deny the permit or the state permitting authorities deny the permit, they're saying you're doing that on the basis of an illegal interpretation of the statute and regs, et cetera. And they're saying, but we're not going to be able to get a court to say that before we actually have to spend the millions of dollars to do that. And that's the problem. Well, that's the tension between when is judicial review appropriate and what point in the process. We would contend if you step in now. And in a permitting process where it all moves quickly, okay, I apply for the permit, you can't get it, you get judicial review, and it all happens. I mean, you can understand why you'd say let's just wait for judicial review in the permitting process. But where there's this lag, and in the lag time you're going to have to spend a lot of money, that should cut. I mean, it doesn't fit neatly into the doctrine, I realize that. But that should cut the other way. I do see where the court is coming from. But I will say that there is give and take in the permit process. I mean, the state and the facility. Give and take. Well, but they will have judicial review before any sledgehammer comes down in the sense of, again, the permitting authorities are making their views known. But there's also an opportunity for pushback from both the applicant, certainly during the public comment process. Again, outside stakeholders affected by these treatment plants. But there's another option I didn't mention, which is they could just continue on doing what they were doing without altering the plan and without having the permit. And then you all would, or someone would take enforcement action against them. And judicial review is available then. Right, but that's the bet the farm thing that the Chief Justice and Justice Alito have talked about. You shouldn't have to bet the farm on your view of the law necessarily. Well, I understand the court's point. But I will point out in SACIT we had the EPA communicating through an order with real legal effect. I mean, the statute said if you do something contrary to this order, it alone subjects you to penalties. Right, and that's the good legal, I mean, that's ultimately you're going back to, which is this is just a letter. We may come out differently down the road in the permitting process. And they're saying, come on, that's not going to happen. And I think... In this permitting process, the facility has a permit. And then a new permit is required, right? It expires after five years generally. The EPA is taking the position that a new permit is required. Correct, but the old one continues until the new one is finalized and ready to take its place. So they can continue beyond the expiration date as long as a timely... Okay, suppose it's finalized in a form that requires the expenditure of millions and billions of dollars to meet a higher standard than prevailed under the previous permit, right? Well, again, they could get the final permit decision stayed so they can continue to operate under the existing permit where they don't have to spend the money for redesign until there's... What are the rules governing that sort of status? They would be under the APA. There may be specific NPDES regulations on that. I'm told that that's standard. Until a judicial review of the permit is completed, the old permit stays in effect until there's a final agency action on the new permit and an immediate judicial review of that. That's either as a matter of course or it's covered by the regulations. I don't understand why if you're confident in the legality of what you're doing, you don't want the judicial review sooner rather than later. Well, let me try to expand on the court's question on that because I think the court may be concerned that there's a binary choice here. You either follow Iowa League or you don't, and that I think is not what's in reality here. The bypass provision, the regulation that this court upheld in 1987, has, as the court itself noted, broad and sensible exceptions. So it's all about how is the bypass regulation being applied to the facility and to what extent is blending allowed and under what circumstances. That's a highly fact-intensive, highly technical determination, and it should be allowed to be worked out in the permit process. So you're saying that blending could be allowed, that it's possible that the EPA could take the position that blending is allowed in some circumstances but not others. Correct. Correct. It depends. I mean, even under Iowa League, the EPA is allowed to regulate some blending because that case dealt with blending where you were still meeting effluent limitations at the end of the pipe. What if you blend and you don't meet them? Certainly the permit can say you can't blend and then have the end of the pipe being out of compliance with the limitations. There's no dispute whatever about that. But my point is that there's a broad range of how much blending can be allowed in a permit, and even under Iowa League, some blending can be regulated by that permit. And it's true that outside the Eighth Circuit, EPA has reserved its right to look at this in an adjudicatory context and see how much blending should we allow under the regulations. But it's not a binary choice of if it's Iowa League or BUST. And I think that goes back to what Judge Williams was saying about the non-acquiescence decision, the alleged non-acquiescence decision by itself, doesn't determine anything in terms of how it affects the facility. This goes back to my first question earlier, because I haven't focused on the preclusion decisions in 1569, which are sort of the outer edge of preclusion decisions. But suppose, you say EPA definitely will not say that an invocation of, again, grassroot policy has been adjudicated under the 120-day rule, go away. But what substantiates that view? Is that that seems to the court that believes the Eighth Circuit was correct in its jurisdictional determination, it seemed to have to say, well, this 120-day rule caused consideration of what's going on here. The only thing it would bar, Your Honor, is if somebody wanted to challenge those grassroot letters anew today. The time for that has expired. Now, we obviously took the position before the Eighth Circuit there was no reason to run to court in the 120 days to sue on the grassroot letters because they didn't promulgate anything. The Eighth Circuit rejected that, but in terms of the EPA applying any policy and including a policy that someone might contend mirrors the policy they were articulated in the grassroot letters, the time has not run. The time hasn't even begun to run. But on the grassroot letters, if someone had tried to sue in another circuit at the same time on that, quote, policy, what would have happened? Well, you'd have to select a circuit to take it exclusively, and that 2012 would govern that, 28 U.S.C. 2012. Yeah, but the point of that provision was to get a national determination up front, except EPA saying whatever circuit it goes to, we're not going to abide by it outside that circuit unless I'm missing something. Well, we will abide by certainly the vacature of the letters. The letters don't exist anywhere. But we're saying if the underlying policy comes up in another matter, another agency action, then we have a right, the EPA has a right not to acquiesce, and there's a scope of non-acquiescence that goes into it. I agree with that as a general proposition, but when there's a funneling of all of the cases to one circuit, suppose the grassroot letter policy had been challenged in every circuit and it gets funneled to the Eighth Circuit, the Eighth Circuit rules the way it does and all the other cases can't go forward, and then EPA says, guess what, for all of you outside the Eighth Circuit, too bad. That seems inconsistent with, at a minimum, the spirit, if not the structure, of the provision funneling the cases to one circuit. Well, there I think you would have, because your Honor posits there'd be a broad swath of interested parties that felt like EPA's publication of the Grassley letter affected them, then it might be a tougher case for the agency to invoke its non-acquiescence rights in that circumstance. But there are entities outside the Eighth Circuit, obviously, that are all over the country that are affected by the policy that was enunciated in those letters, correct? Well, they didn't feel like it was a promulgation of a rule, apparently, and didn't sue on it, but in any event, that's why I think it's important that EPA have the ability to sue because they knew that you all, why waste the money filing a suit when they know there's only one place where you can sue? Well, they would risk their rights being adjudicated, potentially, if the non-acquiescent view you're articulating were the law of the land on that. But I think that's why it's important to look at the default rule and see whether Congress has altered it in a particular setting. What are you referring to as the default rule? The default rule, I would say, is that an agency generally has a right of non-acquiescence outside of the circuit in which the decision was made. I agree with that generally, but again, it's a tricky issue when the cases are all funneled to one circuit. Well, when it's all funneled to one circuit and it's a, at least if we're, EPA is making it obvious that this is something of national applicability, EPA has a full record of respecting that decision throughout the nation. Obviously, in the Clean Air Act setting, it's quite easy, right? This court has exclusive jurisdiction over nationally applicable regulations. The Clean Water Act is a little different in the sense that if you have a single petitioner that's contending, especially in the alleged illegal rule context, that this is affecting me but no one else is saying that. It could be very analogous to a regional permit decision, like under the Clean Air Act,  Again, I don't want to speak for the EPA because, in our view, they haven't made a non-acquiescence decision here. We're laying out in our brief what their rights are. In the brief, you expressed that argument in the form of saying that they were just going to do things case by case, but that's what the policy originally was anyway. That didn't seem to me to remove its non-acquiescence characteristics. The Eighth Circuit found that EPA was not doing it case by case, that they were setting down something legally enforceable through the Grassley letters. The EPA took a different view. It did not prevail on that. Here, even if you were to compare what EPA wrote to the Grassley letters versus the challenged letters here, or even the death statement, they lack comparable. The letters state even less than in the guidance document that this court reviewed in National Mining and found that it didn't command anybody to do anything or refrain from doing anything. It seems like, I'm going to be repeating myself here, but I'll give you another chance to comment on it. The North Star for us, the Supreme Court seems to have said, should be, are people being forced to spend a lot of money before they obtain the judicial review of the legality of the agency decision? In some permitting processes, the answer to that will be no because you just don't get the permit. You get judicial review and you haven't actually tried to build the thing that you would otherwise build if you get the permit. Think of a classic building permit situation. In this situation, I think they're saying it doesn't work that way necessarily because of the timing of the existing permits and the other permits. I think I'm repeating myself, but I'm just trying to work my way through the facts because I don't want to be on the receiving end of a Supreme Court lesson that they've already given. Assertion of the availability of a stay, although we don't at this point in the briefing have any sense of how frequent stays are granted. I would be happy to follow up on a short letter to the court if you wish on that. I just don't have a clear answer for that. I would like that. Now, I don't, well, I'm going to have to take your invitation because I'm clearly not. Maybe not. I'm sorry. I looked down and I missed what you were saying. A short letter? Okay. Let me follow briefly up on your comments. Just to comfort me on that because I think the Supreme Court has been really strong and it's been unanimous. And the court needs to follow its north star. I totally get that. But you said forced. And so the issue in Sackett, yes, they were being forced. It was an order with legal consequences. In Hawks, it was a jurisdictional determination with legal consequences. You were either granting or denying what the court called a safe harbor from prosecution. So it's still, yes, it's the. You're right. It's a different context, I grant it, than the permitting context. And that's why the permitting context often comes out the other way. But they're saying this is a different kind of permitting process. Right. Now, again, if you have some comfort in the word forced, if EPA had issued a national, quote, guidance document that did have commanding, like, but from beginning to end, was a command to state permitting authorities and facilities, you'd have a case closer to Appalachian Power where the court did take review, you know, before the permit process had completed to review the alleged guidance document. Well, and the whole concern in that line of cases, as you're well aware, is that agencies kind of sub silentio make law, I'm using that word in quotes, that forces, again, using that word, people to do things, but evades judicial review. I mean, that was the whole line of cases is about agencies evading judicial review. And that's what we've got to be careful about. And at the risk of repeating myself, I think this court waded through the thicket of all of that well in the national mining case. Right. Can you just go back again to your elaboration of the process? Because the first account of it sounded quite innocent, and the later account involving where we came to the possibility of a stay did not at all. So you have the issuance of a permit by the EPA, but it takes over the process to use that avenue. And the permit requires vast new expenditures, right? And that takes effect, I take it, within some period of time set forth in the permit. Right. I have a little bit of clarity for that, Your Honor. So in terms of when the permit proffered by EPA takes effect, and in terms of when it is automatically stayed when there's a petition for review filed in the Administrative Appeals Board, so that no expenditures to redesign need to be spent until that, at a minimum, until the- That's all within the EPA. Right. Is there equivalent for the state process? I don't know that. I don't know that. I assume it would vary state by state, but I don't know that. Well, we've worked up the EPA, and then what? So what we're unsure of, and my note is consistent with that, we're not sure whether, say, you get a final decision from the Administrative Appeals Board or Environmental Appeals Board, is it automatically stayed through judicial review before a court of appeals or not? That I'm not sure on. You may have to fall back on the motion for stay practice on that question. But we will follow up with a short letter on that. Does Your Honor want information on the state process? I'm not sure how I- If you have it, we welcome it. Okay. Because I think these details are potentially, I'm not sure yet, but potentially important to how we might approach deciding this. So that would be helpful. Unless the court has any further questions, we submit that the petition should be dismissed for want of jurisdiction or in the alternative denied on the merits. Thank you. Thank you. I'll try to keep my rebuttal short on a few key points. Number one, stays are not automatically granted in state court. Under the New Jersey cases that we've presently got under appeal, stays are not in place. With regard to the- That's a view of the New Jersey courts, right? Well, it's the administrative law process that they have before you even get into a court. So they- Is that appealable to an actual court? If you can actually get them to render a decision on the stay, it would be appealable, which is- But that's- I can't classify this complaint without the New Jersey courts. I would go more to the point, Your Honor, that this entire time of permitting and all of these concerns about time permitting, this has been expressly rejected more time by this court than I can care to think of. NIDACAP, Appalachian Power, most recently Hawks and Supreme Court did it. The reason you don't wait for the time of permitting is there are no permit-specific facts that have any relevance to this case, none. That was the same exact thing that the Eighth Circuit concluded, and I will read you, for example, Exhibit 86, the briefing sheet for the Assistant Administrator of Water at the agency. EPA's position is blending is a bypass and can only be justified upon a demonstration of no feasible alternatives. Outside the Eighth Circuit, EPA will continue to apply the bypass rule, consistent with its existing interpretation. Blending is illegal under EPA. There are no facts that one presents up front. You have to show an extensive no feasible alternatives analysis, which is very costly to develop, and even when you develop that, blending is still illegal and must be eliminated over time. So in short, there are no permit-specific facts, and that's precisely what the Eighth Circuit concluded also. So this entire time of permitting is glitches. How is it if it's dependent upon no feasible alternatives, that's not a permit-specific fact? Oh, well, Your Honor, you have to take it in two pieces. The first question is, is the act prohibited by the bypass rule? Answer, yes, in EPA's position. Next one, are there factors where EPA, if you could show them, they might temporarily allow you to do this if you make some extensive analysis and show, for example, let me give you an example. I want to blend 10 million gallons, and that will save me a huge amount of money at the treatment plant. Well, are you telling me there is no feasible alternative to that? Well, I could build another 5 million gallon holding basin, like Allentown could, but then I would still need to blend the last percentage of the flow. So then in order to get the blending approval, they have to spend the extra 5 million and do the extra study, and then over time show that they still can't eliminate it anyway. So there were no case-specific facts on the prohibition, which, by the way, was the key part in the NMA case. The NMA case expressly said, we are not addressing prohibitions or obligations imposed on the regulatory community. I cannot think of anything that more directly imposes an obligation and a prohibition than declaring blending an illegal bypass and then saying the obligation is to do it, to be allowed to do it, is you have to show me all these extra steps. That, I believe, is talking points for a speech that may never be given. Actually, the talking point was for how to respond if they were asked about the incoming letter from five national organizations complaining about EPA's announced position that it would not follow the Iowa League case. That's the talking point up front. The rest of this document is simply what the agency's established position is. And that, by the way, it's the same position that's in the published death statement, which went out to all the regional offices three weeks before this briefing sheet was given to the assistant administrator. So this entire time of permitting, all of that, I mean, it really is just a sham. There are no case-specific facts. This is a regulatory interpretation that's adopted, which, by the way, is also why it's not stayed. What we have is EPA saying there's an adopted bypass rule, and that's on the books, and you must follow it, which is true. There's an adopted bypass rule on the books that everybody in the country must follow. What they're then saying is, and now our interpretation of this is it prohibits A, B, C, and D. I can't stay the bypass rule in my permit. It's an adopted rule. As a matter of fact, this court upheld the rule on the express principle that this position violates. When this challenge came to the bypass rule in 1987, the main challenge was the bypass rule was trying to dictate how I could design a treatment plant. EPA filed briefs, which, by the way, we gave to the Eighth Circuit, and this court's decision expressly said, EPA has told us they are not telling you how to design your treatment plant. They are telling you once you design it that way, you must continue to operate it that way. It's called design operation. The other thing the court said was the bypass rule, and properly does, does not allow you to shut down treatment units. Like, suppose you're running along and half your production goes down. You're at the John Deere factory. You lay half your folks off. You still have an NPDES permit. It's based on a certain amount of production. And then you go, hmm, I can turn off half the units in the plant and still meet those permit numbers. Why? Because I've now had a downturn in the economy. The bypass rule says, no, you can't turn off treatment processes. Blending has nothing to do with turning off treatment processes. It's a separate wet weather treatment train that's used for a specific dire circumstance of peak flows that come into the plant. So this court's decision said what they're doing was improper, too, and EPA said it wasn't going to do it. I would just suggest if anybody is, and I know the court, of course, will do this. EPA recently stated to the D.C. District Court in the FOIA case dealing with these same records, the documents speak for themselves and they are the best evidence of their content. Yes, they are. On their face they say they expressed a non-acquiescence decision and they're going to continue to apply the rules that were vacated. As a matter of fact, the language is virtually identical to the language the court reviewed in NIDACAP. But you know what it's missing? The words case-by-case. This whole case-by-case statement nowhere appears in any of the record documents. Where case-by-case came from, interestingly enough, is a reporter, when she was characterizing EPA's verbal announcement, said, oh, sounds like some kind of case-by-case approach. And then EPA seized on that. Ah, we haven't made a decision. We're operating case-by-case. Look at the documents. The words case-by-case appear nowhere in them. And I would just leave the court one last thought, because we have been arguing for 30 years on illegal rulemaking cases. It's all our firm does is clean water our cases. And EPA's adamant refusal to provide a record to this court or even disclose the records behind its decision-making, in this case is an issue of great concern that we hope the court will address. The EPA justified that action by this following statement. Because EPA never regarded the letters to reflect any substantive decision, it did not contemporaneously maintain a record. Well, that means whenever EPA disagrees that it's undertaken illegal rulemaking, you'll get no records. They always disagree. I don't think they're quite saying that. Well, there's no contemporaneous record. We said, where are the records? They said, we have nothing. And, in fact, we know the, if you will, the hide-the-bodies approach didn't quite work out as well as it might have when all the other documents got released and you could clearly see the entire sequence of their decision. So I guess we would just suggest that illegal rulemaking cases are probably the hardest cases, among the hardest cases this court ever deals with from an administrative regulatory perspective. And when the agency holds all the documents and then doesn't provide any of them to explain what's going on, even the ones that are relevant to the decision, we can't get due process. You can't conduct a proper review. And that really needs to not be the case. I mean, I realize these are one-off and unusual circumstances, but, you know, it's a problem and it's increasing in argument. Thank you. Thank you. I think we've said when a case is reviewable is one of the hardest issues in administrative law. And this case is a fine example. So we'll try to figure it out. That's a disagreement. Yes. Okay. Thank you both. Case is submitted.
judges: Kavanaugh, Wilkins, Williams